**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NEW YORK PROGRESS AND PROTECTION PAC,

                    Plaintiff,

     v.

JAMES A. WALSH, *in his official capacity as Co-Chair of the New York State Board of Elections*; DOUGLAS A. KELLNER, *in his official capacity as Co-Chair of the New York State Board of Elections*; EVELYN J. AQUILA, *in her official capacity as Commissioner of the New York State Board of Elections*; and GREGORY P. PETERSON, *in his official capacity as Commissioner of the New York State Board of Elections*; THE BOARD OF ELECTIONS IN THE CITY OF NEW YORK; FREDERIC M. UMANE, *in his official capacity as President of the Board of Elections in the City of New York*; GREGORY C. SOUMAS, *in his official capacity as Secretary of the Board of Elections in the City of New York*; JOSE MIGUEL ARAUJO, *in his official capacity as Commissioner of the Board of Elections in the City of New York*; NAOMI BARRERA, *in her official capacity as Commissioner of the Board of Elections in the City of New York*; JULIE DENT, *in her official capacity as Commissioner of the Board of Elections in the City of New York*; MARIA R. GUASTELLA, *in her official capacity as Commissioner of the Board of Elections in the City of New York*; MICHAEL MICHEL, *in his official capacity as Commissioner of the Board of Elections in the City of New York*; SIMON SHAMOUN, *in his official capacity as Commissioner of the Board of Elections in the City of New York*; J.P. SIPP, *in his official capacity as Commissioner of the Board of Elections in the City of New York*,

                    Defendants.

**Case No.  13 Civ. 6769**

**Judge Paul A. Crotty**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

FACTS ...................................................................................................................... 4

STANDARD OF REVIEW ...................................................................................... 8

    ARGUMENT .......................................................................................................... 9

    I.     NYPPP IS LIKELY TO SUCCEED ON THE MERITS ..................................... 9

           A.    New York's Ban On Donations For Independent Expenditures In Excess Of $150,000 Is Subject To Heightened Scrutiny And Must Be Tailored To Further An Important Government Interest..................... 9

           B.    New York's Ban On Donations For Independent Expenditures In Excess Of $150,000 Does Not Further Its Purported Purpose Of Preventing Corruption........................................................................... 13

           C.    New York's Ban On Donations For Independent Expenditures In Excess Of $150,000 Is Not Closely Drawn, Let Alone Narrowly Tailored ............................................................................................. 16

    II.    NEW YORK ELECTION LAW IRREPARABLY HARMS NYPPP BY BARRING CONTRIBUTIONS IT WOULD OTHERWISE USE FOR POLITICAL ADVOCACY IN THE 2013 MAYORAL ELECTION ............... 16

    III.   AN INJUNCTION WILL NOT HARM DEFENDANTS OR THE PUBLIC INTEREST ......................................................................... 18

CONCLUSION......................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

CASES

*414 Theater Corp. v. Murphy*,
499 F.2d 1155 (2d Cir. 1974)..................................................................................18

*Am. Civil Liberties Union v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004) ...................................4, 18

*Arizona Free Enterprise Club v. Bennett*,
131 S. Ct. 2806 (2011)..................................................................................*passim*

*Buckley v. Valeo*,
424 U.S. 1 (1976) (per curiam)......................................................................*passim*

*Citizens Against Rent Control v. City of Berkeley*,
454 U.S. 290 (1981)................................................................................................17

*Citizens United v. FEC*,
558 U.S. 310 (2010)...................................................................................*passim*

*Elrod v. Burns*,
427 U.S. 347 (1976) (plurality opinion) ..............................................................17

*FEC v. Nat'l Conservative PAC (NCPAC)*,
470 U.S. 480 (1985)..................................................................................................2

*FEC v. Wis. Right to Life, Inc.*,
551 U.S. 449 (2007)................................................................................................19

*Hedges v. Obama*,
No. 12 Civ. 331, 2012 WL 1721124 (S.D.N.Y. May 16, 2012)..............................8

*Homans v. City of Albuquerque*,
264 F.3d 1240 (10th Cir. 2001) (per curiam)......................................................18

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ...............................................................................17

*Lair v. Murry*,
871 F. Supp. 2d 1058 (D. Mont. 2012)................................................................15

*Long Beach Area Chamber of Commerce v. City of Long Beach*,
603 F.3d 684 (9th Cir. 2010) ................................................................................14

*Michigan Chamber of Commerce v. Land*,
725 F. Supp. 2d 665 (W.D. Mich. 2010) .............................................................18

*North Carolina Right to Life, Inc. v. Leake*,
    525 F.3d 274 (2008) ..................................................................................... 12

*Ognibene v. Parkes*,
    671 F.3d 174 (2d Cir. 2011) ......................................................................... 12

*Personal PAC v. McGuffage*,
    858 F. Supp. 2d 963 (N.D. Ill. 2012) ........................................................... 15

*Pope v. County of Albany*,
    687 F.3d 565 (2d Cir. 2012) ........................................................................... 8

*Republican Party of N.M. v. King*,
    850 F. Supp. 2d 1206 (D.N.M. 2012) ........................................................... 15

*SpeechNow.org v. FEC*,
    599 F.3d 686 (D.C. Cir. 2010) ......................................................... 12, 14, 15

*Stay the Course W. Va. v. Tennant*,
    No. 1:12-cv-01658, 2012 WL 3263623 (S.D. W. Va. Aug. 9, 2012) ............ 15

*Thalheimer v. City of San Diego*,
    645 F.3d 1109 (9th Cir. 2011) ..................................................................... 14

*The Hispanic Leadership Fund, Inc., et al. v. James Walsh et al.*,
    No. 12 Civ. 1337 (Sept. 17, 2012) ............................................................ 8, 11

*Vermont Right to Life Committee, Inc. v. Sorrell*,
    875 F. Supp. 2d 376 (D. Vt. 2012) ............................................................... 14

*Wis. Right to Life State Political Action Comm. v. Barland*,
    664 F.3d 139 (7th Cir. 2011) .................................................................. 13, 14

*Yamada v. Weaver*,
    872 F. Supp. 2d 1023 (D. Haw. 2012) ......................................................... 15

**STATUTES**

2 U.S.C. § 431(8)(A) ........................................................................................ 11

26 U.S.C. § 527 ........................................................................................ 1, 4, 5

N.Y. Elec. Law § 3-104 ..................................................................................... 7

N.Y. Elec. Law § 14-100 ....................................................................... 1, 4, 5, 11

N.Y. Elec. Law § 14-104 ..................................................................................... 1

N.Y. Elec. Law § 14-112 ..................................................................................... 1

N.Y. Elec. Law § 14-114 ............................................................................................... *passim*

N.Y. Elec. Law § 14-126 ...........................................................................................1, 4, 20

**OTHER AUTHORITIES**

Casey Seiler, *Panel: Pay Up or Assets Get Frozen: Board of Elections Gets Serious About Scofflaw Committees*, Timesunion.com (Sept. 18, 2012) *available at* http://www.timesunion.com/local/article/Panel-Pay-up-or-assets-get-frozen-4826121.php...........................................................................................................................8

New York State Board of Elections, *2013 Campaign Finance Handbook* http://www.elections.ny.gov/NYSBOE/download/finance/hndbk2013.pdf............................8

NYSBOE 1994 Opinion No. 3 (Apr. 25, 1994), *available at* http://www.elections.ny.gov/NYSBOE/download/law/Opinions07292013.pdf. ...............7, 13

## INTRODUCTION

Plaintiff New York Progress and Protection PAC ("NYPPP") is a political committee organized under § 527 of the Internal Revenue Code and formed by Craig Engle to advocate for conservative candidates in New York elections.  NYPPP would like to run political advertisements in support of the Republican candidate for New York City Mayor, Joe Lhota, and has solicited funds to support this advocacy.   NYPPP has never coordinated any political expenditure with Joe Lhota, his campaign, or any other political candidate and will not engage in such coordination in the future.  As an "unauthorized political committee" under New York law, NYPPP is prohibited from coordinating with a candidate in any way.  *See* N.Y. Elec. Law §§ 14-112, 14-100(9)(3) & 14-104(1)-(2).  An individual donor, Shaun McCutcheon, has informed NYPPP that he would make a donation of at least $200,000 to help pay for NYPPP's advertising supporting Mr. Lhota but for restrictions in New York law.

It is well-established that NYPPP's advertising and Mr. McCutcheon's support for that advertising are core political expression protected by the First and the Fourteenth Amendments. *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam) (the uninhibited discussion "of public issues and debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution").  However, New York law prohibits Mr. McCutcheon, on pain of civil and criminal penalties, from making any donation that exceeds $150,000, and prohibits NYPPP from accepting it.  *See* N.Y. Elec. Law §§ 14-114(8), 14-126. That prohibition is a blatant violation of longstanding First Amendment principles, which threatens NYPPP with imminent and irreparable injury, and must be preliminary enjoined to prevent a violation of Plaintiff's constitutional rights that could not be remedied after the November 5 mayoral election.

Since at least 1976, it has been clear that, although a State may impose carefully tailored restrictions on contributions to candidates in order to prevent *quid pro quo* corruption, a State is categorically barred from limiting spending by individuals to speak about elections independently from candidates. *Buckley*, 424 U.S. at 20-21. This distinction reflects the "fundamental constitutional difference between money spent to advertise one's views *independently* of the candidate's campaign and money contributed *to the candidate* to be spent on his campaign." *FEC v. Nat'l Conservative PAC (NCPAC)*, 470 U.S. 480, 497 (1985) (emphasis added).

> By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The candidate-funding circuit is broken. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which our case law is concerned.

*Arizona Free Enterprise Club v. Bennett*, 131 S. Ct. 2806, 2826-27 (2011). Because independent expenditures "do not give rise to corruption or the appearance of corruption," there is simply no governmental interest in restricting independent expenditures. *Id.* at 2826 (quoting *Citizens United v. FEC*, 558 U.S. 310, 314 (2010)).

Since it is settled that the State could not restrict NYPPP or Mr. McCutcheon's independent expenditures out of concern for *quid pro quo* corruption of candidates, it necessarily follows that the State cannot restrict Mr. McCutcheon's donations to NYPPP to engage in independent expenditures. There is simply no basis to argue that, although independent political advocacy by NYPPP or Mr. McCutcheon would create no opportunity for candidate corruption, a donation by Mr. McCutcheon to fund NYPPP's independent expenditures would somehow create such a risk. If anything, Mr. McCutcheon's contribution to NYPPP would be less problematic than a direct expenditure. After all, if "separation between candidates and [donors]

negates the possibility that independent expenditures will result in . . . *quid pro quo* corruption," *id.* at 2826-27, the presence of NYPPP as an intermediary further "negates the possibility" of a *quid pro quo* between Mr. McCutcheon and the candidate.  The "candidate-funding circuit is broken" twice over.  *Id.* at 2826.  Accordingly, New York cannot show that its ban on individuals exceeding $150,000 in total contributions furthers in any way its purported interest in preventing corruption.

Indeed, New York's ban on aggregate contributions over $150,000 is so clearly unconstitutional that every Court of Appeals to have addressed the question as well as a host of district courts have all held that there is simply no governmental interest in limiting contributions to independent expenditure-only political committees like Plaintiff.  *See infra* at 14.  All of these courts have therefore concluded that limitations on such contributions would be unconstitutional.

NYPPP is directly injured as a result of New York's aggregate contributions cap, because Mr. McCutcheon will not make his desired donation as long as the ban remains in place. Moreover, absent a preliminary injunction, that injury will be irreparable.  The deprivation of constitutional rights is irreparable as a matter of law.  Moreover, the expressive purpose of the donation—to advocate for the election of Joe Lhota—will be entirely and irrevocably frustrated if the ban remains in place until the November 5 election.  No post-election legal remedy could return to NYPPP and Mr. McCutcheon their constitutional right to fully participate in the political debate over who New York should elect as Mayor in 2013.

The remaining factors governing the issuance of a preliminary injunction—the effect of a preliminary injunction on the defendant and the public interest—also tip decisively in favor of Plaintiff.   The State cannot possibly show that it will be harmed by a preliminary injunction because, as a matter of both law and fact, Mr. McCutcheon's donation creates no meaningful

chance of *quid pro quo* corruption.  Nor will the State be harmed simply because a preliminary injunction would allow Plaintiff to contribute additional speech to the public debate.  Under the First Amendment, more political speech is never an injury.  By the same token, there is no public interest to be served "in the enforcement of an unconstitutional law."  *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003) (internal quotation marks and citation omitted), *aff'd*, 542 U.S. 656 (2004).

Accordingly, Defendants' enforcement of N.Y. Elec. Law §§ 14-114(8) and 14-126(2) should be preliminarily enjoined.

<u>**FACTS**</u>

**A.   NYPPP And Its Donors**

NYPPP is a political action committee registered under Section 527 of the Internal Revenue Code and organized to conduct political advocacy in favor of conservative candidates in New York elections, primarily in the form of video, radio, and print advertising.  Exhibit A ("Engle Decl.") ¶¶ 3,5.  Mr. Engle formed NYPPP in part because he understands that Mr. Lhota has less name recognition and fewer campaign funds than his Democratic opponent and wanted to help make up for that disparity.  *Id.* ¶ 5.  Mr. Engle is an experienced political operative with connections to numerous large donors.  *Id.* ¶ 6.

NYPPP is a "political committee" under the broad definition set forth in N.Y. Elec. Law § 14-100(1).  NYPPP has submitted a statement with the New York Board of Elections identifying itself as a "Type 9," "unauthorized political committee" and identifying Joe Lhota as a candidate it will support.  *Id.* ¶ 13.  Under New York law, an unauthorized political committee may engage only in independent expenditures, but may accept contributions from donors who are under the $150,000 cap.  N.Y. Elec. Law § 14-114(8).  An "authorized" committee may coordinate its activities with a candidate or campaign, but contributions to an authorized

committee are deemed to be a contribution to the candidate, and therefore count toward the lower cap on contributions to a single candidate. *See* N.Y. Elec. Law §§ 14-100(9), 14-114(1) & (4). Thus, New York allows greater donations to and spending by unauthorized committees so long as they limit themselves to independent expenditures while effectively treating authorized committees as extensions of a candidate's campaign.

As required by both Section 527 of the Internal Revenue Code and New York law, NYPPP does not coordinate, and will not coordinate, any of its fundraising efforts or its independent expenditures with any political candidate, campaign, or party. Engle Decl. ¶¶ 12, 17. Nor has any political candidate, campaign, or party authorized NYPPP to act on its behalf or authorized, requested, suggested, fostered, or cooperated with NYPPP in any way related to NYPPP's solicitation, acceptance, or use of any funds. *Id.* ¶ 19. NYPPP does not, and will not, use any portion of the funds it raises for contributions to any political candidate, campaign, or party, or their agents or authorized political committees, or any organization or entity controlled by or coordinating with the aforementioned persons or committees. *Id.* ¶ 12. Craig Engle makes all decisions for NYPPPP concerning the solicitation, acceptance, and use of funds independent of any political candidate, campaign, or party, or their authorized committees. *Id.* ¶ 11.

Mr. McCutcheon is a longtime supporter of the Republican Party who would like to support Mr. Lhota's candidacy for Mayor. Exhibit B ("McCutcheon Decl.") ¶¶ 3, 5. As an Alabama resident who owns an electrical engineering company that operates in the Southeast, Mr. McCutcheon has no direct pecuniary interest in the New York mayoral race. *Id.* ¶ 9. Rather, his interest in the race is ideological. Mr. McCutcheon believes in limited government, lower taxes, and aggressive crime prevention, and frequently supports Republican campaigns throughout the United States because he believes that, over time, a strong Republican Party at the

local level helps develop strong Republican leadership and better policies at the national level. *Id.* ¶ 4. Mr. McCutcheon became interested in contributing to NYPPP after Mr. Lhota won the Republican primary because, like Mr. Engle, he understands that Mr. Lhota has less name recognition and campaign funds than his rival, and would like to even the playing field. *Id.* ¶ 5. Mr. McCutcheon does not have the time or the expertise to supervise directly the production and distribution of political advertisements. *Id.* ¶ 6.

Mr. McCutcheon has committed to NYPPP that, if allowed by New York law, he would donate at least $200,000 to NYPPP. *Id.* ¶ 7. Moreover, based on his extensive experience and contacts, Mr. Engle is confident that numerous other donors would contribute more than $150,000 to NYPPP if allowed to under New York Law. Engle Decl. ¶ 24. However, donors cannot make theses donations and Mr. Engle cannot accept them so long as New York's contribution cap remains in effect.

### B. New York Law.

New York law prohibits any individual from making "contributions" in excess of $150,000 in connection with the nomination or election of candidates in any one calendar year. N.Y. Elec. Law § 14-114(8). A violation of this limit is a misdemeanor. *Id.* § 14-126(4). Likewise, a "political committee" such as NYPPP is prohibited from accepting contributions from individuals that exceed the applicable $150,000 annual aggregate limit for that individual. *Id.* §§ 14-114(8), 14-126. If found to have accepted such a donation, a political committee must return the donation and is subject to a civil penalty "equal to the excess amount plus a fine of up to ten thousand dollars." *Id.* § 14-126(2). Moreover, a committee that "accepts or aids or participates in the acceptance of" such a donation commits a misdemeanor. *Id.* § 14-126(4). N.Y. Elec. Law § 3-104 authorizes the State Defendants, the City Board, and the City

Defendants to investigate suspected violations of the New York State Election Law, including through the issuance of subpoenas, and to refer suspected violations for prosecution, either on their own initiative or at the direction of the New York State Board of Elections ("NYSBOE").

The term "contribution" is defined expansively to include any payment of money made in connection with an election, regardless of whether it is coordinated with a candidate or is also an independent expenditure. *See id.* § 14-100(9) (defining "contribution" to include "any gift, subscription, . . . advance, or deposit of money or any thing of value, made in connection with the nomination for election, or election, of any candidate" as well as "any payment, by any person other than a candidate or a political committee authorized by the candidate, made in connection with the nomination for election or election of any candidate").

Accordingly, as recognized by the NYSBOE "contributions to independent committees are limited by the limits imposed under § 14-114 of the Election Law." NYSBOE 1994 Opinion No. 3 (Apr. 25, 1994).[1] Despite the Supreme Court's recent reaffirmation of the principle that independent expenditures create no cognizable risk of *quid pro quo* corruption, the State Defendants continue to adhere to the position taken in the 1994 Opinion No. 3. Specifically, the NYSBOE's 2013 Campaign Finance Handbook states:

> The U.S. Supreme Court in the *Citizens United* Case addressed the making of independent expenditures by corporations and unions. It did not prohibit limits on contributions, including those made by corporations. An independent expenditure is not the same as a contribution, however, it must be reported by registering and filing with applicable board(s). The decision does **not** change NYS Election Law.

New York State Board of Elections, *2013 Campaign Finance Handbook* at 12 (emphasis in original).[2] In addition, the State Defendants have vigorously defended the cap on contributions for independent expenditures in a pending suit in the Northern District of New York. *See* ECF

---

[1] *available at* http://www.elections.ny.gov/NYSBOE/download/law/Opinions07292013.pdf.
[2] *available at* http://www.elections.ny.gov/NYSBOE/download/finance/hndbk2013.pdf.

No. 27, *The Hispanic Leadership Fund, Inc., et al. v. James Walsh et al.*, No. 12 Civ. 1337 (Sept.

17, 2012) (memorandum of law of State of New York).  The NYSBOE routinely enforces

violations of its campaign finance restrictions.  According to a recent report, the Board has

obtained judgments against more than 4,000 entities for violations since 2007.  *See* Casey Seiler,

*Panel: Pay Up or Assets Get Frozen: Board of Elections Gets Serious About Scofflaw*

*Committees*, Timesunion.com (Sept. 18, 2012).[3]

## STANDARD OF REVIEW

In order for a plaintiff to demonstrate an entitlement to preliminary injunctive

relief, it must demonstrate:

> (a) a likelihood of success on the merits of [its] claims of constitutional infirmity;
> (b) that [it] will suffer irreparable harm in the absence of the requested relief; (c)
> that the balance of the equities tips in its favor; and (d) that the injunction is in the
> public interest.

*Hedges v. Obama*, No. 12 Civ. 331, 2012 WL 1721124, at *19 (S.D.N.Y. May 16, 2012) (citing

*Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008); *Salinger v. Colting*, 607 F.3d 68,

79–80 (2d Cir. 2010)); *Pope v. County of Albany*, 687 F.3d 565, 570 (2d Cir. 2012).

## ARGUMENT

**I.     NYPPP IS LIKELY TO SUCCEED ON THE MERITS.**

**A.     New York's Ban On Donations For Independent Expenditures In Excess Of
$150,000 Is Subject To Heightened Scrutiny And Must Be Tailored To
Further An Important Government Interest.**

Limitations on money spent to influence an election "operate in an area of the most

fundamental First Amendment activities."  *Buckley*, 424 U.S. at 14.  The Supreme Court has

drawn an important constitutional distinction between money that is given to or spent in

coordination with candidates and campaign spending that is independent of candidates.

---

[3] *available at* http://www.timesunion.com/local/article/Panel-Pay-up-or-assets-get-frozen-4826121.php.

Where a State restricts independent expenditures, it must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44-45. Namely, it must show that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (internal quotation marks omitted). This standard reflects that, because "virtually every means of communicating ideas in today's mass society requires the expenditure of money," a restriction on independent expenditures "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley,* 424 U.S. at 19. The Supreme Court has recognized a single interest that can potentially justify restrictions on campaign speech—the prevention of *quid pro quo* corruption. *Arizona Free Enterprise Club*, 131 S. Ct. at 2826-27. However, the Court has repeatedly held that election spending does not pose a cognizable risk of such *quid pro quo* when it is not coordinated with a candidate. *See infra* at 12-13. Accordingly, restrictions on independent expenditures are in practice *per se* unconstitutional. *Id.*

Where a State limits "the amount that any one person or group may contribute *to a candidate or political committee*," its burden is slightly lighter: it need only show that the restriction is "closely drawn" to address a "sufficiently important interest." *Buckley*, 424 U.S. at 25 (emphasis added). This standard is based on two related rationales. First, a contribution to a candidate "serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support." *Id.* at 21. Second, "[a] limitation on the amount of money a person may give to a candidate or campaign organization . . . involves little direct restraint on his political communication, for it . . . does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.*

Since, as detailed below, New York's ban on donations for independent expenditures in excess of $150,000 serves no legitimate purpose, it is invalid under either level of heightened scrutiny set forth in *Buckley*.  It should, however, be subject to strict scrutiny in the same manner as other restrictions on independent expenditures.  *Buckley*'s rationale for applying lower scrutiny for restrictions on candidate contributions was that (1) the donor's interest in expressive association with a candidate would not be directly frustrated by such restrictions and (2) the donor would remain free to pay for speech about the election outside of that association.  However, these rationales do not apply to donations to fund independent expenditures:  the purpose of such independent donations is not to associate with the candidate (any more than any independent expenditure).  Rather, the purpose is to fund speech with a specific message.  As a result, restrictions on such donations strike at the very purpose of the protected act and "necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached."  *Id.* at 19.  Nor, in many cases, would a prospective donor have an alternative avenue for engaging in further speech about the election.  Many donors, like Mr. McCutcheon, lack the time and ability to directly produce political advocacy and therefore rely instead on donations to like-minded political advocacy groups who will help convey the donor's message most effectively.  *See Buckley*, 424 U.S. at 15 (noting that "effective advocacy of both public and private points of view" is "undeniably enhanced by group association") (internal quotation marks and citation omitted).

The State Defendants have argued elsewhere that the donations to unauthorized political committees should be subject to a lower level of scrutiny because such donations are "contributions" and *Buckley* and its progeny draw a distinction between "contributions" and "expenditures."  *See* ECF No. 27 at 14-17, *The Hispanic Leadership Fund,*  No. 12 Civ. 1337.

But that argument improperly assumes that *Buckley* created a dichotomy between independent expenditures on the one hand, and anything labeled a "contribution" one the other.  It did not.  As described above, *Buckley*'s constitutional holding was based on a distinction between the effects of political spending that is *coordinated with candidates* and political spending *independent* of candidates.  Nothing in *Buckley*'s reasoning turned on the fact that some spending was labeled a "contribution" under federal law.  Indeed, the independent expenditures at issue in *Buckley* likely fell within the statutory definition of "contributions" under federal law. *See* 2 U.S.C. § 431(8)(A) (defining "contribution" to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election").  Likewise, direct payments by Mr. McCutcheon to an advertising production company would appear to be a "contribution" under New York law.  *See* N.Y. Elec. Law § 14-100(9) (defining "contribution" to include "any payment . . . made in connection with the nomination for election or election of any candidate").   Yet nobody would argue that a ban on such uncoordinated independent expenditures by individuals should be subject to the lower standard applicable to candidate contributions simply because they constitute "contributions" under the relevant statutes.

In other words, when *Buckley* and its progeny have applied a different standard to restrictions on campaign "contributions," they have uniformly been referring to contributions that are coordinated, directly or indirectly, *with candidates or their parties*, and they have been drawing a distinction between election spending that is coordinated with a campaign and election spending that is not.  *See, e.g.*, *Buckley*, 424 U.S. at 23-38 (upholding limits on contributions by individuals and political committees to candidates as well as an aggregate limit on contributions "to political committees likely to contribute to that candidate, or . . . to the candidate's political

11

party"); *Ognibene v. Parkes*, 671 F.3d 174, 183-84 (2d Cir. 2011) (noting that "the Supreme Court preserved the distinction between expenditures and contributions" in *Citizens United* because the plaintiff "ha[d] not made *direct contributions* to candidates, and it ha[d] not suggested that the Court should reconsider whether contribution limits should be subject to rigorous First Amendment scrutiny") (emphasis added) (quoting *Citizens United*, 558 U.S. at 358); *SpeechNow.org v. FEC*, 599 F.3d 686, 695 (D.C. Cir. 2010) ("[A]s *Citizens United* emphasized, the limits upheld in *Buckley* were limits on contributions made *directly to candidates.*") (emphasis in original).  Because donations for independent expenditures are not coordinated, directly or indirectly, with candidates, restrictions on such donations are subject to strict scrutiny under *Buckley* and are plainly unconstitutional.

That being said, it should be emphasized that New York's limit on donations for direct expenditures is clearly unconstitutional under even the somewhat relaxed heightened scrutiny *Buckley* applied to contributions to candidates.  Under that standard, the State must identify an "important" end and must show that its restriction on speech is "closely drawn" to that end.  As explained below, New York's cap on contributions for independent expenditures fails that level of scrutiny because it is not closely drawn to address any legitimate, much less important, governmental interest.

> **B.    New York's Ban On Donations For Independent Expenditures In Excess Of $150,000 Does Not Further Its Purported Purpose Of Preventing Corruption.**

The only legitimate interest recognized by the Supreme Court as a basis for restricting campaign spending is the government's interest in "preventing corruption or the appearance of corruption," namely the reality or appearance of *quid pro quo* arrangements between candidates and those making contributions.  *See Buckley*, 424 U.S. at 48-49 ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the

relative voice of others is wholly foreign to the First Amendment."); *Citizens United*, 558 U.S. at 359 ("Reliance on a 'generic favoritism or influence theory is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.'") (quoting *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 96 (2003) (opinion of Kennedy J.)); *id.* at 360 ("Ingratiation and access . . . are not corruption."); *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 153 (7th Cir. 2011) (reiterating that "preventing actual or apparent *quid pro quo* corruption is the *only* interest the Supreme Court has recognized as sufficient to justify campaign-finance restrictions") (emphasis in original).  The interest in preventing corruption is also the only interest that Defendants have identified as justifying N.Y. Elec. Law § 14-114(8)'s contribution limit.  *See* 1994 Advisory Opinion No. 3, at 2.

Yet the Supreme Court has repeatedly and categorically concluded that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption" because, "[b]y definition," independent expenditures are "political speech presented to the electorate that is not coordinated with a candidate."  *Citizens United*, 558 U.S. at 357, 360.  The "absence of prearrangement and coordination . . . alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate."  *Id.* at 345 (quoting *Buckley*, 424 U.S. at 47).  Accordingly, independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.  *Id.* at 357; *see also Arizona Free Enterprise Club*, 131 S. Ct. at 2826-27 ("The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in . . . *quid pro quo* corruption.").  Thus, *Citizens United* reaffirmed

*Buckley*'s conclusion that limiting independent expenditures does not further any cognizable interest in preventing corruption.

If the State has no legitimate interest in restricting independent expenditures in order to prevent corruption, it equally lacks any interest in restricting contributions for such expenditures. That is, if New York cannot restrict NYPPP or Mr. McCutcheon from spending money independently, it necessarily follows that New York cannot restrict Mr. McCutcheon from donating money to NYPPP to engage in independent expenditures.  There is simply no basis to argue that, although separate, independent advocacy by NYPPP and Mr. McCutcheon poses no opportunity for candidate corruption, Mr. McCutcheon creates a risk of corruption by giving money to NYPPP to engage in independent advocacy.

Accordingly, all courts that have considered limits on contributions to independent expenditure-only organizations have reached universal agreement that such limits cannot withstand First Amendment scrutiny.  *SpeechNow.org*, 599 F.3d at 694-96; *Wis. Right to Life State Political Action Comm.*, 664 F.3d at 154; *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1121 (9th Cir. 2011); *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010); *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 292-93 (2008); *Vermont Right to Life Committee, Inc. v. Sorrell*, 875 F. Supp. 2d 376, 403-404 (D. Vt. 2012); *Yamada v. Weaver*, 872 F. Supp. 2d 1023, 1042-43 (D. Haw. 2012); *Lair v. Murry*, 871 F. Supp. 2d 1058, 1068 (D. Mont. 2012) *Personal PAC v. McGuffage*, 858 F. Supp. 2d 963, 968-69 (N.D. Ill. 2012); *Republican Party of N.M. v. King*, 850 F. Supp. 2d 1206, 1215 (D.N.M. 2012); *Stay the Course W. Va. v. Tennant*, No. 1:12-cv-01658, 2012 WL 3263623, *6 (S.D. W. Va. Aug. 9, 2012).

In *SpeechNow.org*, for example, an *en banc* D.C. Circuit unanimously recognized that *Citizens United* held, "as a matter of law," that "independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption."  599 F.3d at 694.  Therefore, "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption" and the Supreme Court "has effectively held that there is no corrupting 'quid' for which a candidate might in exchange offer a corrupt 'quo.'"  *Id*. at 694-95.  Since a donor has a protected First Amendment interest in contributing money to be used for independent expenditures and the State has no legitimate interest in restricting such expenditures, "something outweighs nothing every time."  *Id*. at 695 (quoting *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989)).

Of course, these cases do not hold—and NYPPP does not argue—that the First Amendment prevent limits on contributions to groups whose spending is coordinated, directly or indirectly, with political candidates or their agents.  Such spending falls on the other side of *Buckley*'s critical distinction between coordinated spending and uncoordinated spending.  Because there is coordination, it is at least possible that the contribution could reflect a *quid pro quo* arrangement; but where that circuit is broken, there can be no cognizable risk of corruption.

Indeed, although independent expenditures themselves pose no cognizable risk of corruption, *contributions for* independent expenditures are even less problematic from a corruption standpoint.  While "separation between candidates and [donors] negates the possibility that independent expenditures will result in . . . *quid pro quo* corruption" by itself, the presence of a *separate* political committee as an intermediary further "negates the possibility" of a *quid pro quo*.  *Arizona Free Enterprise Club*, 131 S. Ct. at 2826-27.

**C.    New York's Ban On Donations For Independent Expenditures In Excess Of $150,000 Is Not Closely Drawn, Let Alone Narrowly Tailored.**

Section 14-114(8) fails for an additional and independent reason: even assuming that contributions to fund independent expenditures could somehow create a risk of corruption in some cases, the blanket ban imposed by § 14-114(8) would still be dramatically overbroad.

Under § 14-114(8), large contributions are banned in numerous situations in which *quid pro quo* corruption is particularly implausible.  Mr. McCutcheon's desired donation to NYPPP illustrates that overbreadth: it is difficult to fathom how that contribution could create a *quid pro quo* exchange with Mr. Lhota when, in addition to having never met Mr. Lhota, Mr. McCutcheon has no pecuniary interest in any policy that Mr. Lhota could affect.  Yet New York has made no effort to craft more tailored restrictions that address more specifically its supposed interest in preventing corruption.  Accordingly, § 14-114(8) is not closely drawn, let alone narrowly tailored.

**II.    NEW YORK ELECTION LAW IRREPARABLY HARMS NYPPP BY BARRING CONTRIBUTIONS IT WOULD OTHERWISE USE FOR POLITICAL ADVOCACY IN THE 2013 MAYORAL ELECTION.**

As described above, Section 14-114(8) of the New York State Election Law prohibits Mr. McCutcheon and others from contributing more than $150,000 to NYPPP in a given calendar year.  Section 14-114(8) also prohibits contributions to NYPPP by other individuals who have already contributed $150,000 to other candidates, parties, or committees "in connection with the nomination or election of persons to state and local public offices and party positions within the state of New York," or who have contributed amounts less than $150,000 but wish to contribute amounts that, when all is combined, would exceed the $150,000 annual aggregate limit.  But for Section 14-114(8), NYPPP would receive a contribution of at least $200,000 from Mr. McCutcheon, which it would use to advocate in favor of the election of Joe Lhota for Mayor.

16

Engle Decl. ¶ 23; McCutcheon Decl. ¶ 7.  NYPPP also intends to solicit further donations from

large donors, and Mr. Engle, based on his extensive experience and contacts, is confident that

other large donations would be forthcoming.  Engle Decl. ¶ 24.  However, Section 14-114(8)

bars NYPPP from accepting any of these contributions.

By denying NYPPP the ability to solicit and accept funds that it would use for political

speech, Defendants are preventing NYPPP from engaging in political advocacy during the 2013

New York mayoral election.  *See Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290,

299 (1981) ("Placing limits on contributions which in turn limit expenditures plainly impairs

freedom of expression.").  That is a quintessential form of irreparable harm. "The loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  While the right to

participate in the political process is always present, it gains importance during an election, when

"the ability of the citizenry to make informed choices among candidates for office" is most

essential, "for the identities of those who are elected will inevitably shape the course that we

follow as a nation." *Buckley*, 424 U.S. at 14-15; *see also Klein v. City of San Clemente*, 584 F.3d

1196, 1208 (9th Cir. 2009) (internal quotation marks and citation omitted) ("The harm is

particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is

of the essence in politics and a delay of even a day or two may be intolerable.").  With the New

York Mayor's election rapidly approaching, any delay in NYPPP's ability to disseminate its

message is an irreparable infringement on its First Amendment rights, as well as an irreparable

harm to the political process.

By the same token, NYPPP's constitutional injury could not be compensated with post-election relief or after-the-fact money damages. Absent a preliminary injunction, NYPPP will have been deprived of its right to urge New Yorkers to vote for Joe Lhota in the 2013 mayoral election. And once the mayoral election has been conducted, the opportunity to influence the 2013 election can never be restored. As the Second Circuit has held, there is simply "no means to make up for the irretrievable loss of that which would have been expressed." *414 Theater Corp. v. Murphy*, 499 F.2d 1155, 1160 (2d Cir. 1974).

## III. AN INJUNCTION WILL NOT HARM DEFENDANTS OR THE PUBLIC INTEREST.

Even if NYPPP did not have an overwhelming likelihood of success on the merits, it would still be entitled to a preliminary injunction. NYPPP clearly has a significant chance of prevailing on the merits and will plainly suffer an irreparable injury if a preliminary injunction is denied. Yet, on the other side of the balance, Defendants cannot point to any harm to themselves or the public that would result from the issuance of a preliminary injunction.

The State "does not have an interest in the enforcement of an unconstitutional law." *Am. Civil Liberties Union*, 322 F.3d at 247 (internal quotation marks and citation omitted). Rather, the public interest "always strongly favors the vindication of constitutional rights and the invalidation of any state action which infringes on those rights or chills their confident and unfettered exercise." *Michigan Chamber of Commerce v. Land*, 725 F. Supp. 2d 665, 698 (W.D. Mich. 2010); *see also Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) (per curiam) ("[T]he public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression.").

Moreover, even if this Court were to issue a preliminary injunction but later conclude that NYPPP's claim failed on the merits, neither Defendants nor the public would suffer any actual

harm.  As discussed above, there is no basis to infer that independent expenditures would create a risk or appearance of corruption.  *See supra* at 13-14.  That is particularly true in this case as Mr. McCutcheon has no pecuniary interest in New York policies.  *Id.*

Nor can Defendants claim that they or the public would be harmed simply by the additional speech that would result if NYPPP were allowed to accept additional contributions. New York would not be injured by the presence of additional political advocacy providing more information from more viewpoints.  "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed to secure the widest possible dissemination of information from diverse and antagonistic sources."  *Buckley*, 424 U.S. at 48-49.  Moreover, even if New York could have an interest in suppressing NYPPP's speech to "enhance the relative voice of others"—which it does not—there is simply no basis to believe that such suppression is necessary here to prevent Mr. McCutcheon and NYPPP from drowning out the supporters of Mr. Lhota's well-funded and well-known opponent.  In short, there is no basis to believe Defendants or the public will be harmed in any way from allowing Mr. McCutcheon and NYPPP to engage in additional political speech.

\*     \*     \*

Thus, all of the factors heavily weigh in favor of granting NYPPP's request for a preliminary injunction.  This is especially so given that NYPPP's First Amendment rights are at stake, as the Court "must give the benefit of any doubt to protecting rather than stifling speech." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007).  NYPPP's motion for a preliminary injunction against Defendants' continued application of N.Y. Elec. Law §§ 14-114(8) and 14-

126 to limit individuals' contributions to groups making only independent expenditures should be granted.

## CONCLUSION

For the foregoing reasons, NYPPP respectfully requests that the Court preliminarily enjoin Defendants' application of the aggregate contribution limits set forth in N.Y. Elec. Law § 14-114(8), as well as the related penalty provisions set forth in N.Y. Elec. Law § 14-126, as applied to independent expenditure-only political committees.

Dated: September 26, 2013          Respectfully submitted,
       New York, New York

                      /s/ Todd R. Geremia_____
                      Todd R. Geremia (TG-4454)
                      JONES DAY
                      222 East 41st Street
                      New York, New York  10017
                      (212) 326-3939
                      tgeremia@jonesday.com

                      Michael A. Carvin (*pro hac vice application pending*)
                      Louis K. Fisher (LF-1230)
                      Warren Postman (*pro hac vice application pending*)
                      JONES DAY
                      51 Louisiana Ave. N.W.
                      Washington D.C.  20001
                      (202) 879-3939
                      macarvin@jonesday.com
                      lkfisher@jonesday.com
                      wpostman@jonesday.com